**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ESTATE OF ANDREA YVONNE ARRINGTON,   :
                                     :
            Plaintiff,               :     CIVIL ACTION
                                     :
      v.                             :
                                     :     NO. 11-cv-4534
OFFICER JOHN MICHAEL, and the        :
CITY OF CHESTER,                     :
                                     :
            Defendants.              :

**MEMORANDUM AND ORDER**

**Joyner, C.J.**                              **December 18, 2012**

      Before the Court are the Defendants' Motion for Summary
Judgment (ECF No. 21) and the Plaintiff's Motion for Partial
Summary Judgment (ECF No. 24).  For the reasons set forth in this
Memorandum, we grant the Defendants' Motion in part and deny it
in part, and we deny the Plaintiff's Motion.

**I.  BACKGROUND**

      This matter arises out of the tragic deaths of the
Plaintiff's decedent, Andrea Yvonne Arrington, and Aaron Michael,
the son of Defendant Officer John Michael.  (Def.'s Stmt. of
Material Facts (the "Def.'s SMF") ¶¶ 1-2.)  The Plaintiff
principally asserts that, because Aaron Michael shot and killed
Ms. Arrington with Officer Michael's inadequately secured police-
issued service weapon, Officer Michael and his employer, the City
of Chester (the "City"), deprived Ms. Arrington of her
constitutional rights and should bear liability pursuant to 42

1

U.S.C. § 1983.  (<u>See generally</u> Compl.)

A.   <u>The Relationship Between Aaron Michael and Ms. Arrington</u>

Ms. Arrington and Aaron Michael shared an apartment with their young son in Chester beginning in 2007.  (Def.'s SMF ¶ 3.) On July 2, 2009, Ms. Arrington filed a petition in the Court of Common Pleas of Delaware County seeking a Temporary Protection From Abuse Order.  <u>Id.</u> ¶¶ 3-4.  The petition alleged that Aaron Michael had assaulted Ms. Arrington three to four days earlier and recited other occasions when Aaron Michael had hit or threatened to hit Ms. Arrington.  <u>Id.</u> ¶¶ 4-5.  The court granted the petition, issued the order (the "July 2 Order"), and scheduled a hearing for July 9, 2009.  <u>Id.</u> ¶ 9.  The July 2 Order evicted Aaron Michael from the couple's shared apartment, granted custody of the couple's son to Ms. Arrington, and forbade Aaron Michael from possessing, transferring or acquiring firearms.  <u>Id.</u> ¶ 8; (Def.'s Ex. D-1 (the "July 2 Order"), at 10).  Following the hearing on July 9, the court issued a final Protection from Abuse Order (the "July 9 Order") which extended the terms of the July 2 Order for six months.  (Def.'s SMF ¶ 10; Pl.'s Ex. K (the "July 9 Order"), at 3.)

On July 14, Aaron Michael violated the July 9 Order by going to the apartment from which the July 9 Order had evicted him and threatening Ms. Arrington.  (Def.'s SMF ¶ 11.) Specifically, Aaron Michael threatened physical harm if Ms.

Arrington contacted law enforcement to report the violation of the July 9 Order.  Id.  Ms. Arrington reported the violation after Aaron Michael fled the apartment.  Id.

A Chester police officer, William Swanson, responded to Ms. Arrington's call.  Id. ¶ 12.  Officer Swanson investigated, prepared a police report, and filed a criminal complaint against Aaron Michael for violation of the July 9 Order.  Id. ¶¶ 12-13; (Def.'s Ex. D-5, at 1-2).  Officer Swanson also requested a warrant for Aaron Michael's arrest.  (Def.'s SMF ¶ 13.)  Despite Officer Swanson filing the request for the arrest warrant on July 15, the warrant did not issue until July 20.  Id. ¶¶ 14-15; (Def.'s Ex. D-6, at 1).

After Aaron Michael violated the July 9 Order, he went to stay with another woman with whom he had a romantic relationship, Ashley Miller.  (Def.'s SMF ¶ 39.)  Between July 14 and July 20, Aaron Michael primarily stayed with Ms. Miller, believing that Officer Michael had "set him up" to be arrested.  Id.; (Def.'s Ex. D-23 (the "Miller Dep."), at 26:19-27:17 (Feb. 15, 2011)).

B.   Officer Michael's Actions

After the July 2 Order issued, a colleague on the police force informed Officer Michael about it.  (Def.'s Ex. D-24 (the "Michael Dep."), at 11:23-12:16 (Oct. 24, 2011).)  The same day, July 2, Officer Michael told Aaron Michael about the July 2 Order.  Id. at 12:13-13:12.  Aaron Michael then came to Officer

Michael's home.  Id. at 13:13-15:9.

Aaron Michael had a key to the front door of Officer Michael's home.  Id. at 9:17-11:22.  Aaron Michael stored some of his personal effects at Officer Michael's home and continued to receive mail there through July 2009.  Id. at 14:20-20:20, 62:22-63:9.  Sometimes, he would come to Officer Michael's home when Officer Michael was not present.  Id. at 19:5-25.  Officer Michael also knew of his son's extensive criminal history, including threatening a former romantic partner, check fraud, and theft.  Id. at 6:6-8:22.

After Officer Michael told his son about the July 2 Order, the two men discussed its accusations; Officer Michael also advised his son that, should he need to go to the apartment he shared with Ms. Arrington to retrieve certain of his personal effect, he should go escorted by police officers.  Id. at 21:6-27:6.  Aaron Michael, citing the upcoming holiday weekend, left Officer Michael's house to stay with certain unspecified friends.  Id. at 25:24-26:12.

Early on the morning of July 15, a friend of Aaron Michael's called Officer Michael to tell him that Aaron Michael had violated the July 9 Order.  (Def.'s SMF ¶ 32.)  Officer Michael then telephoned a superior of his in the Chester Police Department (the "Department"), Captain Amaro, who told Officer Michael that a warrant for his son's arrest would issue.

(Michael Dep. at 69:15-70:25 (Oct. 24, 2011).)

Although Officer Michael tried to reach his son by telephone, he could not do so.  Id. at 71:1-73:3.  As a result, on July 16, Officer Michael wrote his son two notes, id. at 66:14-67:21, and left them on the dining room table in his home, next to mail addressed to Aaron Michael, in the hope that, if Aaron Michael came to retrieve his mail, he would see the notes, id. at 73:9-74:8.

The first note, four pages long, asked Aaron Michael to turn himself in based on the outstanding warrant and discussed the benefits of surrendering in comparison to attempting to evade the warrant.  (Michael Dep. Ex. 6, at 1-4.)  This note also offered Aaron Michael a $1,500 "bonus" for surrendering, offered to pay any bail imposed, and referred to the situation as "not that serious."  Id. at 4.  The second note, two pages long, also pleaded with Aaron Michael to surrender himself and noted that Aaron Michael's probation officer "will do what he can for [Aaron Michael], he knows [Officer Michael] is a police officer.  They will give you a courtesy break. [Officer Michael] already talked to people, but in order to get this one time break, [Aaron Michael] ha[s] to turn [him]self in."  (Michael Dep. Ex. 7, at 1-2; Michael Dep. at 81:16-21 (Oct. 24, 2011).)  It appears that Officer Michael also left a copy of Officer Swanson's police report about the July 14 incident with the two notes.  (See

5

Def.'s Ex. D-10, at 23; Pl.'s Mot. for Partial Summ. J. ¶ 39; Def.'s Response to Pl.'s Cross-Mot. for Summ. J. ¶ 39.)

On Friday, July 17, Aaron Michael called his father and left a message on the answering machine at Officer Michael's home. (See Michael Dep. at 74:12-75:3 (Oct. 24, 2011).)  In the message, Aaron Michael told Officer Michael that he intended to surrender to the authorities once the warrant for his arrest issued.  Id. at 74:17-21.  When Officer Michael returned to his home on July 17 and listened to the message, the notes to Aaron Michael appeared as they had on July 16, and mail addressed to Aaron Michael was still on the dining room table of the house as before.  Id. at 78:20-79:5.  It is not clear how Aaron Michael discovered that a warrant would issue for his arrest based on the July 14 incident.  Evidence exists in the record suggesting that Aaron Michael believed that his father "had set him up to get arrested" (Miller Dep. at 18:10-22 (Feb. 15, 2011)), but the record is silent about whether Officer Michael knew that his son thought so.

Officer Michael left Chester for a vacation in Florida on July 20.  (Michael Dep. at 27:7-10 (Oct. 24, 2011).)  Before leaving for Florida, Officer Michael left his service weapon in his locked bedroom and secured the weapon with a Department-issue gun lock.  Id. at 36:6-37:20.  Officer Michael stored the key to the single-bolt bedroom lock in a kitchen cabinet.  See id. at

53:22-55:16.  Officer Michael put the weapon, empty of ammunition
and secured by the gun lock, in the bedroom's closet hidden under
some bedroom linens.  (Def. Ex. D-33, at 6.)  Officer Michael hid
the ammunition inside a duffel bag located in the bedroom.  Id.
Officer Michael stored the only key[1] to the gun lock separately,
inside a sock in a bureau drawer in the bedroom.  Id.; (see also
Def.'s SMF ¶ 21.)

C.   The City's Relevant Policies

     The Department officially encouraged, but did not require,
officers to take their service weapons home with them when they
were not on duty.  (Pl.'s Ex. U (the "Chubb Dep."), at 45:20-
46:24 (May 23, 2012).)  The Department trained officers to store
their service weapons unloaded, preferably in a locked container,
and separately from the weapon's ammunition.  Id. at 36:9-37:8.
The Department also trained officers to secure a service weapon
with a Department-issue gun lock, but the Department did not
specifically train officers about where or how to store the key
to the gun lock.  Id. at 37:9-38:5.  Department training
materials do address the security of a service weapon stored at
an officer's home, directing officers to "secure [a weapon] in a
safe place with consideration as to children, friends & family."
(Pl.'s Ex. X, at 2.)

-----

[1] Although Officer Michael had been issued two keys to the gun lock, one
had been misplaced as of July 2009.  (Michael Dep. at 85:6-86:18 (Oct. 24,
2011).)

The Department also had a regulation which "establish[ed] Department policy, guidelines, and procedures in the enforcement, reporting, and prosecution of domestic of domestic violence / Protection From Abuse (PFA) Order violations." (Pl.'s Ex. W, at 1.)  This directive established Department policy as, among other things, strictly enforcing Protection From Abuse Orders and arresting violators of such orders and other perpetrators of crimes of domestic violence.  Id. at 1,4-5.

Finally, the Department issued a directive which established a policy of preventing officers from becoming involved in law enforcement situations with family members or relatives.  (Pl.'s Ex. V.)  The directive called upon officers involved in non-emergency situations with family members or relatives to make superiors aware of the relationship and arrange for alternate personnel to respond.  Id.  The directive specifically excepted emergency situations from its operation.  Id.

None of these regulations, nor any other Department policy, specifically addressed how they should apply or interact when the perpetrator of a crime of domestic violence or the subject of a Protection From Abuse Order was a relative of a police officer and had access to a police officer's home where the officer typically stored his service weapon.  (Pl.'s Mot. for Partial Summ. J. ¶¶ 49-50; Def.'s Response to Pl.'s Cross-Mot. for Summ. J. ¶¶ 49-50.)  The Department did not have any new or different

procedures or policies which specifically addressed such a
situation, nor did the Department conduct specific training
sessions about how to respond to such a situation.  (Pl.'s Mot.
for Partial Summ. J. ¶ 49; Def.'s Response to Pl.'s Cross-Mot.
for Summ. J. ¶ 49.)

D.    The July 20, 2009 Incident

    Sometime on July 20, 2009, Aaron Michael went to his
father's home.  (Def.'s Ex. D-10, at 8.)  It appears that he
drank a great deal of alcohol there.  Id. at 22.  He moved the
notes that his father had written him several days earlier, along
with the copy of Officer Swanson's police report about the July
14 incident, from the kitchen table to one of the upstairs
bedrooms in the house, indicating that he saw and read all three
documents.  See id.

    He also forced open the locked door to his father's bedroom,
id. at 23, apparently unaware that Officer Michael had hidden the
key to the bedroom in the house (Michael Dep. at 53:22-54:6 (Oct.
24, 2011).)  Inside the bedroom, Aaron Michael located his
father's service weapon and ammunition in the closet, then
discovered the key to the gun lock in a drawer in the bedroom.
(Def.'s Ex. D-10, at 8.)  He then conducted internet research
about how to load the weapon, disengage the safety, and otherwise
operate the weapon.  Id. at 7-8.

    Just after 11:30 p.m. on July 20, Ridley Township police

responded to a report of gunshots at Ms. Arrington's residence. Id. at 3.  The Ridley Township officers discovered Ms. Arrington with numerous gunshot wounds.  Id.  She was transported to Crozer-Chester Medical Center, where she was pronounced dead shortly after 7:00 a.m. on July 21.  Id.

At about the same time as the report of gunfire at Ms. Arrington's residence, Aaron Michael telephoned two of his friends and apparently spoke to both of them simultaneously.  Id. at 20.  Aaron Michael confessed to shooting Ms. Arrington, as well as to killing two of his young children on earlier occasions.  Id. at 8-10, 20.  Aaron Michael also described how he had broken into his father's bedroom, found his father's service weapon, discovered the gun lock key, and learned how to operate the weapon.  Id.  One of the friends to whom Aaron Michael spoke thought Aaron Michael had been drinking.  Id. at 20.

After the report of gunfire at Ms. Arrington's residence, officers of the Department were dispatched to Officer Michael's home.  Id. at 3.  There, they encountered Aaron Michael, armed with his father's service weapon.  Id.  When Aaron Michael did not comply with the officers' instructions and pointed the weapon at them, one of them fired, striking him in the chest.  Id. at 19.  Aaron Michael was pronounced dead less than an hour later. Id. at 3.

E.   This Action

10

The Estate of Andrea Arrington by and through Audra L. Thornton Arrington, Administratrix of her Estate (the "Plaintiff") brought this action pursuant to 42 U.S.C. § 1983 on July 18, 2011.  The Plaintiff brings claims for deprivation of Ms. Arrington's substantive due process rights against Officer Michael under a state created danger theory and against the City on a failure to train theory pursuant to the doctrine announced in <u>Monell v. Dep't of Soc. Servs.</u> (<u>Monell</u>), 436 U.S. 658 (1978).

## II.  STANDARD OF REVIEW

Upon considering a motion for summary judgment, the Court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (alteration in original) (internal quotation marks omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading; its response, by affidavits or as otherwise provided in this rule, must set forth

specific facts showing that there is a genuine issue for trial."
Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001)
(alteration in original) (internal quotation marks omitted).

The summary judgment standard does not change when parties
have filed cross-motions for summary judgment.  Applemans v. City
of Phila., 826 F.2d 214, 216 (3d Cir. 1987).  We "must rule on
each party's motion on an individual and separate basis,
determining, for each side, whether a judgment may be entered in
accordance with the Rule 56 standard."  Schlegel v. Life Ins. Co.
Of N. Am., 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting
10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal
Practice and Procedure § 2720 (1998)).  If review of
cross-motions reveals no genuine issue of material fact, then
judgment may be granted in favor of the party entitled to
judgment in view of the law and undisputed facts.  Iberia Foods
Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998) (citation
omitted).

**III.  DISCUSSION**

A.  State-Created Danger

The Plaintiff brings a § 1983 claim against Officer Michael
for depriving Arrington of her Fourteenth Amendment substantive
due process rights under a state created danger theory.  Officer
Michael argues that the record warrants summary judgment in his
favor because: (1) he was not acting under color of state law,

(2) the harm to Ms. Arrington was insufficiently foreseeable, (3) he did not act with the requisite culpability with respect to Ms. Arrington's safety, (4) no special relationship between Officer Michael and Ms. Arrington existed, (5) he did not affirmatively use his authority to create an opportunity for danger, (6) qualified immunity shields him from suit, and (7) the statutory immunity provided in 18 U.S.C. § 922(z) shields him from suit. Because material factual disputes exist with regard to all of these arguments, summary judgment is not proper.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

"Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1368 (3d Cir. 1992)). Although the Due Process Clause does not require the state to take affirmative steps to protect its citizens from violence inflicted by private parties, see DeShaney

13

v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195-96
(1989), the state-created danger doctrine serves as a limited
exception to this general proposition, see Phillips, 515 F.3d at
235.  The doctrine has four elements:

> (1) the harm ultimately caused to the
> plaintiff was foreseeable and fairly
> direct; (2) the state-actor acted in
> willful disregard for the plaintiff's
> safety; (3) there was some relationship
> between the state and the plaintiff; and
> (4) the state-actor used his authority to
> create an opportunity for danger that
> otherwise would not have existed.

Id.[2] (citing Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d
Cir. 2006)) (footnote omitted).

1. *Action Under Color of State Law*

Officer Michael first argues that the record contains no
evidence from which a reasonable juror could conclude that he
acted under color of state law such that § 1983 applies.  This
argument has no merit.  Courts routinely consider off-duty
officers to have acted under color of state law.[3]  E.g.,

---

[2] Some cases describe the culpability element as a "degree of
culpability that shocks the conscience."  Sanford v. Stiles, 456 F.3d 298, 304
(3d Cir. 2006).  The Third Circuit has applied three standards depending on
the behavior of the state actor and particular circumstances of each case: (1)
deliberate indifference, (2) gross negligence and arbitrariness, and (3)
intent to cause harm.  See id. at 305-306.  This Court has previously
determined that, in these circumstances, if Officer Michael acted with
deliberate indifference to the threat of harm to Ms. Arrington, his conduct
would shock the conscience.  See id.; see also County of Sacramento v. Lewis,
523 U.S. 833, 849-54 (1998); Miller v. City of Philadelphia, 174 F.3d 368,
371, 375-76 (3d Cir. 1999).  Officer Michael does not propose a different
standard.

[3] Officer Michael cites to Burkhart v. Knepper, 310 F. Supp. 2d 734
(W.D. Pa. 2004) for the proposition that an off-duty officer's use of his
service weapon in a confrontation does not establish that he acted under color

14

Bonenberger v. Plymouth Township, 132 F.3d 20, 23-25 (3d Cir. 1997).  Officer Michael also had the discretion, granted to him by the Department, to store his service weapon at home if he so chose.  (Chubb Dep. at 45:20-46:24 (May 23, 2012).)  At a minimum, the evidence of this discretion suffices for a rational juror to conclude that Officer Michael "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Bonenberger, 132 F.3d at 23 (internal quotations omitted).  We also note that Officer Michael himself invoked his official authority in his attempts to persuade his son to surrender to the authorities.  (Michael Dep. Ex. 7, at 1-2; Michael Dep. at 81:16-21 (Oct. 24, 2011).)  This evidence could also permit a reasonable juror to conclude that Officer Michael acted under color of state law.  See Bonenberger, 132 F.3d at 23.  Summary judgment on this basis is not proper.

*2.  Causation*

Officer Michael clearly did foresee that Aaron Michael might visit his home during his vacation.  (Michael Dep. at 73:9-74:8 (Oct. 24, 2011).)  Officer Michael nonetheless argues that the

---

of state law, as well as to Liedy v. Borough of Glenolden, 117 F. App'x 176 (3d Cir. 2004) for the proposition that an on duty officer's failure to arrest a parolee surrendering on a bench warrant did not warrant imposing liability on him.  Because neither the Liedy Court nor the Burkhart Court resolved the questions before it on the basis that the defendants did not act under color of state law, we are not persuaded.  See 117 F. App'x at 179-81; 310 F. Supp. 2d at 738-42.

15

record warrants summary judgment in his favor because he could
not have foreseen his son's actions upon visiting the home,
including breaking into his father's locked bedroom in order to
locate his father's service weapon.  The record shows that
Officer Michael knew of his son's criminal history (Michael Dep.
at 6:6-8:22 (Oct. 24, 2011)), that he had possession of the
police report documenting his son's criminal violation of the
July 9 Order and his criminal threats of physical violence
against Ms. Arrington (Def.'s Ex. D-10, at 23; Pl.'s Mot. for
Partial Summ. J. ¶ 39; Def.'s Response to Pl.'s Cross-Mot. for
Summ. J. ¶ 39), that his son had a key to the house (Michael Dep.
at 9:17-11:22, 14:20-20:20 (Oct. 24, 2011)), and that he could
have inferred that his son knew that he stored his service weapon
in the house, <u>see</u> <u>id.</u> at 34:16-36:5.  This evidence would permit
a reasonable juror to conclude that Officer Michael had a
sufficiently concrete awareness of the risk his service weapon
posed to Ms. Arrington when stored at home, unattended, and
secured only by a single deadbolt and a gun lock whose key lay in
the same room.  <u>See Phillips</u>, 515 F.3d at 238.  Summary judgment
on this basis is not proper.

*3.  Culpability*

     Officer Michael argues that the record here would not permit
a reasonable juror to conclude that he acted with deliberate
indifference, rather than blamelessly or with mere negligence, to

the safety of Ms. Arrington.  See Sanford v. Stiles, 456 F.3d 298, 305-306, 311 (3d Cir. 2006).  Here, the record does contain sufficient evidence for a reasonable juror, crediting the evidence and drawing reasonable inferences in the Plaintiff's favor, to conclude that Officer Michael acted with deliberate indifference for Ms. Arrington's safety.  See, e.g., Kneipp v. Tedder, 95 F.3d 1199, 1208-1209 (3d Cir. 1996); see also Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 910 n.10 (3d Cir. 1997) ("[T]he state's actions must evince a willingness to ignore a foreseeable danger or risk.")  Again, one could reasonably infer from the record that Officer Michael knew his son posed a grave risk to Ms. Arrington's safety but nonetheless chose to secure his service weapon at the home which his son could access behind a single deadbolt and with a gun lock whose key lay in the same room.  (Michael Dep. at 6:6-8:22, 9:17-11:22, 14:20-20:20, 34:16-36:5 (Oct. 24, 2011); Def.'s Ex. D-10, at 23; Pl.'s Mot. for Partial Summ. J. ¶ 39; Def.'s Response to Pl.'s Cross-Mot. for Summ. J. ¶ 39.)  A reasonable juror could, on this basis, conclude that Officer Michael acted with the requisite culpability for state created danger liability when he willingly ignored a foreseeable risk to Ms. Arrington's safey.[4]

---

[4] On this same basis, sufficient material factual disputes exist for the Plaintiff's claim for punitive damages to go to the jury.  See Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989) ("[R]eckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages.") (internal quotations omitted).

*4.  Relationship with State*

Officer Michael argues that no special relationship existed between him and Ms. Arrington such that state created danger liability is unavailable.  This requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense."  Phillips, 515 F.3d at 242 (quoting Morse, 132 F.3d at 912).  We have already concluded that Ms. Arrington was the foreseeable victim of Officer Michael's actions; a reasonable juror could conclude that Officer Michael knew his son posed a grave risk to Ms. Arrington's safety but nonetheless chose to secure his service weapon at the home which his son could access behind a single deadbolt and a gun lock whose key lay in the same room.  Ms. Arrington was certainly a foreseeable victim of his actions under traditional tort principles; the state created danger doctrine does not require more.  See Phillips, 515 F.3d at 242.

*5.  Creation of Danger*

Officer Michael argues that he took no affirmative steps that enhanced the danger to Ms. Arrington and that the absence of evidence of any affirmative act warrants summary judgment in his favor.  We disagree.

The state created danger doctrine requires that an officer use his authority in a way that created a danger or that rendered the foreseeable victim more vulnerable to danger than had he not

18

acted at all.  See Sanford, 456 F.3d at 311.  The doctrine
requires an affirmative act, see Phillips, 515 F.3d at 236; see
also Kneipp, 95 F.3d at 1209, and a failure to act cannot support
a state created danger claim, see, e.g., Bennett v. City of
Phila., 499 F.3d 281, 288 (3d Cir. 2007).

On this record, a jury could conclude that Officer Michael's
actions went beyond "mere failure to protect an individual
against private violence."  See id.  Officer Michael, having the
discretion not to take his weapon home (Chubb Dep. at 45:20-46:24
(May 23, 2012)), and knowing that his son would likely visit his
home (Michael Dep. at 73:9-74:8 (Oct. 24, 2011)), nonetheless
decided to store the weapon at home during his vacation.[5]  In
addition, Officer Michael, in contrast to at least one of his
colleagues, exercised his discretion to leave the key to his gun
lock in the same room as the gun lock, rather than storing it
elsewhere or carrying it with him.[6]  (Def. Ex. D-33, at 6; Def.'s

---

[5] Officer Michael argues that he merely followed his own individual
custom when he took the weapon home for storage while he was on vacation and
that this fact precludes the conclusion that he acted affirmatively when he
did so.  The opposite is true.  Officer Michael possessed the discretion,
granted him by the Department, to deviate from this custom.  (Chubb Dep. at
45:20-46:24 (May 23, 2012).)  A reasonable juror could interpret his decision
to follow his custom in these circumstances, especially in light of the
evidence suggesting that he was aware of his sons threats of violence against
Ms. Arrington (Def.'s Ex. D-10, at 23; Pl.'s Mot. for Partial Summ. J. ¶ 39;
Def.'s Response to Pl.'s Cross-Mot. for Summ. J. ¶ 39), as an affirmative act.
Although a reasonable juror could also decline to reach this conclusion, a
material factual dispute exists which precludes summary judgment on this
basis.

[6] Again, although a reasonable juror could conclude that this decision
represents a mere failure to act instead of an affirmative act, a reasonable
juror could also conclude, based on this evidence, that Officer Michael did
act affirmatively in exercising his discretion to store the key to the gun

SMF ¶ 21; Chubb Dep. at 37:14-38:5, 72:14-73:10 (May 23, 2012).)
Because a reasonable juror could conclude, based on this
evidence, that Officer Michael exercised his discretion in a
manner which left Ms. Arrington more vulnerable to catastrophic
violence at the hands of Aaron Michael, summary judgment on this
basis is not proper. <u>See</u>, <u>e.g.</u>, <u>Starr v. Price</u>, 385 F. Supp. 2d
502, 508 (M.D. Pa. 2005).

One can also infer from the record that Officer Michael took
the affirmative act of leaving a copy of Officer Swanson's police
report about the July 14 incident, which detailed Aaron Michael's
command to Ms. Arrington not to report the violation of the July
9 Order to the authorities and Ms. Arrington's subsequent
decision to report the violation, on his kitchen table for his
son to find.  (Def.'s Ex. D-10, at 23; Pl.'s Mot. for Partial
Summ. J. ¶ 39; Def.'s Response to Pl.'s Cross-Mot. for Summ. J. ¶
39.)  Given that Aaron Michael appears to have read this document
at or about the time he broke into Officer Michael's bedroom and
took his service weapon, one can infer that the decision to leave
this document for Aaron Michael to find also materially increased
the risk of harm to Ms. Arrington.  <u>See</u>, <u>e.g.</u>, <u>Starr</u>, 385 F.
Supp. 2d at 508.

This record evidence, taken together, creates triable
factual issues about whether Officer Michael used his authority

---

lock inside the bedroom.  <u>See</u> discussion <u>supra</u> note 5.

in a way that rendered Ms. Arrington more vulnerable to danger
than had he not acted at all.  Summary judgment on this basis is
not proper.

*6. Qualified Immunity*

Officer Michael further contends that the doctrine of
qualified immunity shields him from liability.  Because the
applicability of the qualified immunity doctrine depends on the
resolution of the material factual disputes we have already
identified, we may not apply it at this time.

Government actors engaged in discretionary conduct are
subject to qualified immunity.  See Lamont v. New Jersey, 637
F.3d 177, 182 (3d Cir. 2011) (citing Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982)).  An officer who violates a constitutional
right may not avail himself of qualified immunity if the "right
was clearly established, such that 'it would have been clear to a
reasonable officer that his conduct was unlawful in the situation
he confronted.'"  Id. (quoting Saucier v. Katz, 533 U.S. 194,
201-202 (2001)) (alterations omitted).  The qualified immunity
issue should be addressed "at the earliest possible stage of
litigation."  Pearson v. Callahan, 555 U.S. 223, 232 (2009)
(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Here, it is clearly established that an officer is liable
under the state-created danger doctrine when the officer is aware
of the risk of grave harm and is responsible, at least in part,

for creating that risk.  See Rivas v. City of Passaic, 365 F.3d
181, 200-201 (3d Cir. 2004) (Garth, J.); see also United States
v. Lanier, 520 U.S. 259, 271 (1997) ("[A] general constitutional
rule already identified in the decisional law may apply with
obvious clarity to the specific conduct in question, even though
the very action in question has [not] previously been held
unlawful.") (internal quotations omitted)).  The relevant
constitutional right was clearly established as of July 2009.

Moreover, material factual disputes prevent resolution of
the question whether it would have been clear to a reasonable
officer in Officer Michael's position that his conduct was
unlawful.  Construing the record in the light most favorable to
the Plaintiff, Officer Michael knew his son was threatening Ms.
Arrington, knew his son was ordered by the court to stay away
from her, and had access to information that his son was
violating that order and threatening Ms. Arrington if she
reported the violation.  (Def.'s Ex. D-10, at 23; Pl.'s Mot. for
Partial Summ. J. ¶ 39; Def.'s Response to Pl.'s Cross-Mot. for
Summ. J. ¶ 39.)  In light of these circumstances, Officer Michael
chose to store his service weapon and ammunition at home,
unattended and with the key necessary to use the weapon in the
same room as the weapon, where he could have foreseen that his
son could access both by disabling a single deadbolt.  (Michael
Dep. at 6:6-8:22, 9:17-11:22, 14:20-20:20, 34:16-36:5 (Oct. 24,

2011).)  So viewed, it would have been clear to a reasonable officer that this conduct would create a sufficient risk of harm to a foreseeable victim, Ms. Arrington.  But, viewing the record in the light most favorable to Officer Michael and declining to draw inferences in the Plaintiff's favor, he could not have foreseen the subsequent tragic events of July 20, and it would not have been clear to a reasonable officer that this conduct would create such a risk to Ms. Arrington.

Material disputes therefore exist about the factual predicates necessary to apply the doctrine of qualified immunity to shield Officer Michael from suit.  Accordingly, summary judgment in Officer Michael's favor on this basis is not proper.

7.  *Child Safety Lock Act of 2005 Statutory Immunity*

Finally, Officer Michael argues that he is entitled to statutory immunity pursuant to the Child Safety Lock Act of 2005, Pub. L. No. 109-92, § 5, 119 Stat. 2095 (codified at 18 U.S.C. § 922(z)(3)).  Because material factual disputes exist on this record about whether the statute immunizes Officer Michael from civil liability in these circumstances, summary judgment is improper on this basis.

"Notwithstanding any other provision of law, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, shall be entitled to immunity from a qualified civil liability action."

23

18 U.S.C. § 922(z)(3)(A).  As relevant here, a "qualified civil liability action" is "(I) . . . a civil action brought by any person against a person described in subparagraph (A) for damages resulting from the criminal or unlawful misuse of the handgun by a third party, if . . . (I) the handgun was accessed by another person who did not have the permission or authorization of the person having lawful possession and control of the handgun to have access to it; and . . . (II) at the time access was gained by the person not so authorized, the handgun had been <u>made</u> <u>inoperable</u> by use of a secure gun storage or safety device."  18 U.S.C. § 922(z)(3)(C) (emphasis added).  It follows that the statute immunizes the lawful custodian of a firearm from the relevant liability for a third party's unlawful use of the firearm if the lawful custodian has used a "secure gun storage or safety device"[7] to make the firearm "inoperable."  <u>See</u> <u>id.</u>

Congress' use of the term "inoperable" is puzzling.  A strict reading of the term "inoperable" would make it impossible for the immunity provision to apply at all; a third party, no matter how determined, cannot fire a truly "inoperable" firearm

---

[7] Congress has further defined the term "secure gun storage or safety device" to mean "(A) a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device; (B) a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or (C) a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means." 18 U.S.C. § 921(a)(34).  None of the parties to this action dispute that Officer Michael's Department-issue gun lock qualifies as a "secure gun storage or safety device" within the meaning of this definition.

and could, therefore, cause no harm which might result in liability from which the statute may immunize him or her.  But a loose reading of the term "inoperable" does not accord with the word's plain meaning.  See Webster's II New Riverside University Dictionary 630, 823 (3d ed. 1994) (defining "inoperable" as "[n]ot operable" and defining "operable" as "[c]apable of being used or operated").

The meaning of the term "inoperable" and the intended scope of the immunity provision are therefore ambiguous.  And it appears that no court has ever cited § 922(z) for any substantive purpose, much less interpreted the ambiguous immunity provision at issue here.[8]

The limited legislative history discussing the immunity provision provides some guidance as to the interpretation of the term "inoperable."  This legislative history envisions a gun owner's use of a safety device as a fact-specific defense.  See 151 Cong. Rec. E2162-63 (daily ed. Oct. 20, 2005) (statement of Rep. Stearns) ("Finally, compliance or noncompliance [with the statute's safety lock provisions] could not even be used as evidence, except . . . by a gun owner who wanted to present his

---

[8] The only citation to § 922(z) which this Court has uncovered appears in an appendix reproducing the entirety of the Protection of Lawful Commerce in Arms Act, the legislative vehicle which contained the Child Safety Lock Act of 2005, in City of New York v. Beretta U.S.A. Corp., 401 F. Supp. 2d 244, 303-304 (E.D.N.Y. 2005) (Weinstein, J.), aff'd in part and rev'd in part by 524 F.3d 384 (2d Cir. 2008), cert. denied 129 S. Ct. 1579 (2009).  Neither Judge Weinstein's order nor the decision on appeal addressed the meaning of any provision of § 922(z) in any way.

use of a safety device as a defense against a civil suit.  On that point, section 5 provides a new defense, not a new line of attack. . . .  <u>The [immunity] language neither creates nor eliminates liability for gun owners who use safety devices; in effect, it leaves the common law rules unchanged for those gun owners</u>.") (emphasis added).

In the absence of express guidance on the scope of immunity provided in § 922(z)(3), and taking into the account the legislative history's reference to "common law rules," <u>id.</u>, the Court concludes that it is appropriate to read into the statutory term "made inoperable" a requirement that, for the immunity provision to apply, the secure gun storage or safety device must make the firearm inoperable by reasonably foreseeable means. This interpretation not only accords with the statute's legislative history but also gives effect to the immunity provision insofar as it immunizes responsible gun owners who cannot foresee the manner in which their reasonable security measures were compromised.  At the same time, this interpretation prevents the immunity provision from becoming surplusage because it would otherwise only immunize liability which, because such liability requires the operation of an "inoperable" firearm, cannot occur.

Applying this interpretation here, the Court concludes that, as in the qualified immunity context, it is appropriate to defer

26

resolution of this question of <u>law</u> until the factfinder determines certain predicate issues of <u>fact</u>.  <u>See</u> <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 242-43 (3d Cir. 2004).  On this record, material factual disputes exist about whether Officer Michael's actions actually rendered his service weapon "inoperable" by reasonably foreseeable means.  A reasonable juror could conclude that the use of a gun lock behind a locked bedroom door with the gun lock key stored in the same bedroom renders a firearm so secured inoperable by reasonably foreseeable means.  A reasonable juror could also conclude the opposite.  Accordingly, whether Officer Michael's use of the gun lock with the key stored in the same room behind a single deadbolt rendered his service weapon "inoperable" through reasonably foreseeable means and whether the other elements of the immunity provision are met is properly resolved after trial.

B.  Monell Liability

     The Plaintiff also brings a <u>Monell</u> claim for municipal liability against the City on two theories: (1) the City failed to train its police officers with regard to the storage and security of firearms when cohabitants of the officer are prohibited from possessing firearms because of a Protection From Abuse Order, and (2) the City lacked sufficient policies and procedures regarding the proper storage of service weapons and how to handle encounters with family members who may be subject

to protection orders or post-conviction state supervision. Citing the same largely undisputed facts, the Plaintiff and the City both move for summary judgment on this claim.  We conclude that summary judgment is appropriate in the City's favor on the Plaintiff's <u>Monell</u> claim.

A municipality may be found liable where the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>Monell</u>, 436 U.S. at 690.  Such actions can take two forms: an official policy or a custom or usage.  <u>Id.</u> at 691.  "Although not authorized by written law, [] practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." <u>Id.</u> (citation omitted).  Inadequate police training may also be the basis for municipal liability if the deficient training amounts to "deliberate indifference" to the rights of the person aggrieved.  <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

In order to sustain <u>Monell</u> liability, a plaintiff must also establish both culpability and causation.  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." <u>Board of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404 (1997).  The plaintiff "must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."   Id.

Here, it is undisputed that, although the Department had official policies and training sessions about how officers should exercise their discretion in storing their service weapons, how to respond to domestic violence crimes of violations of Protection From Abuse Orders, and how to respond to incidents involving their relatives, the Department had no such policies or training sessions about how officers should act in the specific circumstances present here.  (Pl.'s Mot. for Partial Summ. J. ¶¶ 49-50; Def.'s Response to Pl.'s Cross-Mot. for Summ. J. ¶¶ 49-50.)  Rather than disputing the underlying facts, the parties simply dispute the legal effect of the absence of such policies and training sessions.

First, on these undisputed facts, no reasonable juror could conclude that the City and the Department acted unconstitutionally.  The City and the Department offered reasonable policy guidance and training for an officer to navigate the difficult factual circumstances in which Officer Michael found himself in July 2009.  The Department trained officers to consider "children, friends & family" in determining where to store a service weapon at home (Pl.'s Ex. X, at 2), had an official policy that "[p]olice [o]fficers will not be directed

or involve themselves in situations or circumstances involving family members or relatives unless an emergency situation exists" (Pl.'s Ex. V), and had an official policy of strict enforcement of protection from abuse orders and criminal provisions encompassing acts of domestic violence (Pl.'s Ex. W, at 1). Although these policies perhaps could have been more comprehensive, such shortcomings do not a constitutional violation make.

Even assuming that any deficiency in these policies and training sessions had constitutional import, the Plaintiff has presented no evidence that, when the City or the Department failed to adopt policies or conduct training sessions on how to respond to the factual circumstances present here, they acted with deliberate indifference to the known or obvious consequences of such a failure. See Natale v. Camden Cnty. Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003) (citing Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)). The Plaintiff has pointed to no similar incidents in the past which would have put the City or the Department on notice that their failures to act would likely result in the tragic outcome that resulted here. Moreover, given that the evidence, viewed in the light most favorable to the Plaintiff, suggests that Officer Michael did not follow the guidance and training which the Department did provide to him, no reasonable factfinder could conclude that these

policies and training sessions were so obviously inadequate as to permit imposition of Monell liability without a pattern of similar prior violations.  See Berg, 219 F.3d at 276.

To the extent that the Plaintiff argues that Monell liability arises from the City's failure to train officers other than Officer Michael about how to respond to these unique factual circumstances, this analysis applies with equal force.  The report of the Plaintiff's expert witness, Dr. Evan Stark,[9] concludes that the City's and the Department's training, procedures, and policies were so inadequate that they caused all of the officers involved in the relevant events to respond improperly.  (Def.'s Ex. D-37, at 20-23.)  But Dr. Stark pointedly does not conclude that the need for additional specific training, policies, and procedures about how to respond to this factual scenario was sufficiently obvious that a reasonable juror could appropriately impose Monell liability without evidence of a pattern of similar prior violations.  See id.; see also Berg, 219 F.3d at 276.  Nor does Dr. Stark conclude that the inadequacies he identifies in the Department's general domestic violence policy, procedures, and training were similarly obvious such that a reasonable juror, crediting his conclusions, could impose

---

[9] The Defendants have filed a Motion in Limine (ECF No. 26) to exclude Dr. Stark's report in its entirety and to preclude his testimony at trial.  We defer resolution of this Motion to a date closer to trial and note that whether we consider his report properly part of the summary judgment record would not alter our conclusions with respect to the pending cross-motions for summary judgment.

31

liability on the City without evidence of a pattern of similar violations.  (See Def.'s Ex. D-37, at 20-23); see also Berg, 219 F.3d at 276.  The measures Dr. Stark faults the City and the Department for not implementing may well be desirable and good policy, but, on this record, the failure to implement them absent a pattern of prior similar incidents cannot support Monell liability for the City.

We conclude that the City's and the Department's undisputed failure to implement policies and conduct training sessions about how officers should respond to the unique facts present here does not represent a constitutional violation.  Even if it did, the City and the Department did not act with the requisite culpability in failing to implement additional policies or conduct additional trainings.  Summary judgment is therefore appropriate in the City's favor on the Monell claim.

**IV.  CONCLUSION**

For these reasons, the Defendants' Motion for Summary Judgment is granted in part and denied in part, and the Plaintiff's Motion for Partial Summary Judgment is denied.  An appropriate order follows.